UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **MICHAEL KILLION,** | |
| **Plaintiff,** | |
| *vs.* | CAUSE NO.  1: 14-cv-1201-DKL-SEB |
| **CAROLYN W. COLVIN, Commissioner of Social Security,** | |
| **Defendant.** | |

### ENTRY

Plaintiff Michael Killion applied for disability insurance benefits and a period of disability with an onset date in May 2011.  The defendant Commissioner of Social Security denied his application and Mr. Killion filed this suit for judicial review of that denial.

### Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. ' 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from the principle that

Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. ' 416.905(a). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A) and

2

1382c(a)(3)(B).  20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966.  The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process.  42 U.S.C. ' § 423(d)(2)(B) and 1382c(a)(3)(G).  20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  If disability status can be determined at any step in the sequence, an application will not be reviewed further.  At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the applicant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling.  20 C.F.R. ' 404.1525.  If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy,

together with any additional non-exertional restrictions. At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy. 42 U.S.C. ' 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level. Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v.*

4

*Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review.  42 U.S.C. ' 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

**Background**

From 1984 to his alleged disability-onset date, May 1, 2011, Mr. Killion worked for the Indianapolis Power & Light Company, first as a meter reader, then from 2000 to 2004

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (' 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

in one of the company's power plants, and finally, from April 2004 to May 1, 2011, as a cut-off man.  He has had medical problems with his cervical and thoracic spine and has undergone five total cervical-vertebrae fusions (decompressive laminectomies), two in 2003 and three in March 2012.  The ALJ found that Mr. Killion meets the insured-status requirements through December 31, 2016.

At step one of the sequential evaluation process, the ALJ found that Mr. Killion has not engaged in substantial gainful activity since his alleged onset date.  At step two, the ALJ found that Mr. Killion has the severe impairments of a cervical spine dysfunction[2] and a thoracic spine dysfunction.[3]  The ALJ found that Mr. Killion's impairments of hypertension, hyperlipidemia, insomnia, gastroesophageal reflux disease, medicinal side effect of constipation, an allergic rhinitis are not severe.  She also found that his alleged fibromyalgia/myofacial pain/myalgia and depression are not medically determined impairments.  At step three, the ALJ found that Mr. Killion's impairments, severe and non-severe, singly and in combination, do not meet or medically equal any of the conditions in the listing of impairments.  She examined the criteria of listing 1.04, disorders of the spine.

The ALJ then determined Mr. Killion's RFC.  She found that he has the RFC for light work with the following additional restrictions:  only frequent stooping, crouching,

---

[2] Spondylosis/cervicalgia with remote surgery and evidence of solid arthrodesis, facet arthropathy, and fact narrowing and additional surgical intervention for decompression laminectomy of C4, 5, and 6.

[3] Tiny central disc protrusion at T7-8 and perineural cysts at T6-7 and T7-8.

crawling, and climbing; only occasional overhead reaching; and only frequent reaching in all directions.  Mr. Killion alleged that his spinal dysfunctions cause pain and weakness in his back, neck, and arms, with symptoms radiating into his hands.  He alleged that his surgeries were unhelpful.  Functionally, he alleged that he could walk twenty-five minutes to the store; he can drive to appointments and to visit family, but he has pain when he looks around in traffic; he has more difficulty reaching with his arms since his neck surgery.

The ALJ found that Mr. Killion's spinal dysfunctions reasonably caused the types of symptoms that he alleged, but that the alleged degree and extent of his symptoms and their functionally limiting effects were not entirely credible.  She cited examination and test results showing full or minimally limited cervical and thoracic ranges of motion, normal or full strengths in his extremities, a conservative course of treatment, and other normal findings (*e.g.*, gait, negative straight-leg raising, sensations).  She found that the results of full strength and normal ranges of motion are inconsistent with the limitations alleged by Mr. Killion.  She wrote that she accommodated Mr. Killion's spine impairments by restricting him to light work and no more than frequent stooping, crouching, crawling, and climbing, and that she accommodated his cervical spine dysfunction and pain with her reaching restrictions.

At step four, the ALJ found that, while Mr. Killion did not have the RFC to perform his past relevant work as he actually performed it, his RFC permits him to perform his

7

previous jobs of meter reader and cut-out man as they are generally performed in the economy. Thus, she found him not disabled.

When the Commissioner's Appeals Council denied Mr. Killion's request for review, the ALJ's decision became the final decision of the Commissioner and the one that the Court reviews.

## Discussion

Mr. Killion argues three errors in the ALJ's decision.

**1. ALJ's finding that Mr. Killion's past relevant work, as generally performed, does not require frequent neck motion.** The ALJ found that Mr. Killion does not have the RFC to perform his past relevant work as a cut-off man and meter man as he actually performed the jobs. However, she found that, as they are generally performed in the economy, the jobs do not require frequent cervical motion and that Mr. Killion retains the RFC to satisfy that criterion. (R. 32.) Mr. Killion argues that substantial evidence does not support the ALJ's finding that his past relevant jobs as generally performed require do not require frequent cervical motion.

The ALJ wrote: "I have considered the claimant's description of how he specifically performed the job and how he felt it required specific cervical motion. Consequently, to the claimant's benefit, I find the claimant could not perform the job as he actually or specifically performed it." (*Id.* (citation omitted).) Although she had received job descriptions for each job from Mr. Killion's employer, they did not include

8

"function-by-function requirements," which is the reason she gave for relying on Mr. Killion's description of how he performed the jobs. However, the ALJ wrote that she was "bound by the statute and regulations and must consider if the claimant retains the functional capacity to meet the demands of the work as generally performed and as described in the DOT [the Department of Labor's *Dictionary of Occupational Titles* ("*D.O.T.*")]." (R. 32.) She noted that the *D.O.T.* does not include job requirements related to neck motion for the cut-off-man or meter-man jobs and she concluded that "[t]he job requirements as generally performed did not require frequent cervical motion." Therefore, she found that, "[b]ased on the DOT, his past work as generally performed is not precluded." (*Id.*) She noted that the *D.O.T.* descriptions closely match those provided by Mr. Killion's employer and the testimony of the vocational expert and none of these sources note frequent cervical motion as a requirement.

The ALJ improperly concluded that she was bound by the absence of a cervical-motion criterion in the *D.O.T.* descriptions; she incorrectly interpreted the vocational expert's testimony; and substantial evidence does not support her finding that the jobs as generally performed do not require frequent cervical motion.

The ALJ did not cite any authority supporting her statement that, despite Mr. Killion's (and, as explained below, the vocational expert's) testimony, she is "bound by the statute and regulations" to the *D.O.T.* descriptions and, because those descriptions are silent with regard to cervical motion, the jobs have no cervical-motion requirements. Social Security Ruling 00-4p provides that "[i]n making disability determinations, we rely

9

primarily on the DOT" but that "neither the DOT nor the [vocational expert] or [vocational specialist] automatically 'trumps' when there is a conflict."  Instead, adjudicators are required to obtain reasonable explanations for any conflicts between occupational evidence provided by vocational experts and the *D.O.T.*  Social Security Ruling 82-62 provides that "[t]he decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed an explained fully in the disability decision.  Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit."  The ALJ was not bound to follow the *D.O.T.* descriptions in case of a conflict or inconsistency with a claimant's and/or vocational expert's testimony and it is illogical to find that, because the *D.O.T.* descriptions are silent as to cervical motion requirements, that there are no such requirements.

But the ALJ did not go as far as finding no cervical-motion requirements, because she affirmatively found that the jobs as generally performed do not require frequent cervical motion, which she must have found is Mr. Killion's limit.  The only dispositive difference that she identified between the jobs as he actually performed them and as they are generally performed is cervical motion.  Yet she articulated no analysis of the differences in cervical motion between the two.  There is no basis in the record to support her conclusion that Mr. Killion's past relevant jobs as actually performed is different than how they are generally performed.  She implicitly found that, as actually performed, the jobs required frequent cervical motion and she explicitly found that the jobs as generally

performed do not require frequent cervical motion, with no explanation and that was error under, at least, S.S.R. 82-62 and S.S.R. 00-4p.

The ALJ wrote that "[a] function-by-function comparison of the DOT entries . . . supports" her latter finding and that it "is consistent with the vocational expert testimony." (R. 32.) Yet the vocational expert's testimony provides no substantial or reasonable support for her finding. After establishing that the *D.O.T.* does not "classify anything regarding neck motion" regarding the two jobs at issue, the ALJ asked the vocational expert whether, in his experience, he has "any information regarding the need or requirements for neck motion with any of these jobs?" and the vocational expert answered "It would only be my professional [*sic*] in that it would be occasional." (R. 71.) What this means is obscure — profession experience, guess, speculation? — and does not support the ALJ's finding that frequent cervical motion is not a feature of the jobs as generally performed.

The ALJ then asked "based on your testimony and based on your experience about neck motion with these jobs" whether the jobs would be available to an individual who could not perform occasional neck motions, and the vocational expert answered that such an individual could not perform those jobs. (R. 72.) However, when Mr. Killion's attorney focused the vocational expert's attention on the driving requirement for a cut-

off man and meter man,[4] the vocational expert clarified that his "occasional neck motion" answer did not take that this aspect into consideration:

> Q  Back to [the vocational expert], the claimant's testified that basically he was driving to every one of these locations that he would go to throughout the day.  Do you find that that's consistent with your understanding of the jobs of meter reader and the other one, the cutoff man?
>
> A  I would agree with that.
>
> Q  Okay.  When the judge asked you how often you had to turn your head, I think that was her question, and you replied occasional with regard to neck turning, were you taking into account the driving required for the job?
>
> A  I was more thinking about the job — doing the job as far as looking at the meter or being in front of a meter and doing that work.
>
> Q  So you were not considering the turning of the head to be required to make turns and you know like driving and changing lanes, things like that?
>
> A  Not really.  Although you know you have your side mirrors, and your rear view mirror.  I don't know how much I can go into —
>
> Q  Sure.
>
> A  — you know a person's going — their head.  I don't think a turn's going to get 90 degrees.  It might get in the 20 degree area, but also you're moving one's eyes while that driving is taking place.  So it's not an area that I'm real familiar with.

(R. 82-84.)  The vocational expert clearly testified that his testimony that only occasional cervical motion is required for the jobs as generally performed did not account for the driving requirements of the jobs and that cervical motion while driving is not an area

---

[4] Mr. Killion testified that he left his job as meter reader when Indianapolis Power & Light Company eliminated meter reading and transitioned to automation. (R. 61.) When asked if the job of meter reader exists anymore or is obsolete, the vocational expert testified that "From what I've seen, a meter reader is going to be pretty much done computer wise — * * * And I would agree with that statement that [when] the DOT was done, that was a common, everyday occurrence [meter reading].  You still have I think gas meter readers, but as far as electrical and water, you don't see it very much."  (R. 83-84.)

with which he is "real familiar." Thus, the vocational expert's testimony does not provide substantial evidence to support the ALJ's finding that the jobs, as generally performed in the economy, do not require frequent cervical motion or any particular level of cervical motion.

The ALJ cannot fall back on the absence of any inclusion of the jobs' driving component in the *D.O.T.* descriptions because she necessarily found that that the jobs, as actually performed, required frequent neck motion and rendered those jobs unavailable to Mr. Killion. Mr. Killion testified that his last cut-off-man job required driving to at least 60 locations in an area of about five miles by ten miles, (R. 47, 74), and that it was the need to move his neck while driving, as well as pushing, pulling, and working above his head, that caused his inability to perform that job, (R. 47-48, 52). He testified that he still experiences neck pain while driving, despite the amount of medication that he takes. (R. 55-56.) He testified that the meter-man job required walking approximately fifteen to twenty miles each day to read from three hundred to fifteen hundred meters, (R. 49), and that he could not handle the walking or driving involved anymore, (R. 61). Mr. Killion testified that, even after his last cervical fusion surgery in March 2012 (the hearing was held in July 2012), he has pain with cervical motion either left-to-right or up-and-down. He can barely move his neck and beyond a certain point, it will flare up with pain to an eight or nine on a ten-point scale. (R. 59-60.) His complaints of neck pain on motion and notes of reduced ranges of motion are noted in the record. (See, *e.g.*, R. 292-94, 295, 311, 315-17, 325, 399, 481.)

13

Therefore, in light of her finding on the as-performed jobs and Mr. Killion's allegations and the requirements of S.S.R. 82-62, the ALJ was required to careful compare the cervical-motion requirements between his past relevant jobs as he actually performed them and as they are generally performed in the economy, and to resolve any conflicts or inconsistencies between Mr. Killions testimony, the vocational expert's testimony, and the *D.O.T.* descriptions.

In summary, the *D.O.T.* descriptions are silent with respect to cervical motion. The ALJ already found that, as performed, the jobs required driving and frequent cervical motion. While the vocational expert's testimony confirmed the driving requirement for the jobs as generally performed, it provided nothing substantial on the cervical-motion requirements of the jobs as generally performed. Thus, the ALJ failed to develop the record on the cervical-motion requirements of the jobs as generally performed; her finding that the jobs as generally performed do not require frequent cervical motion is not supported by substantial evidence; and she failed to resolve or explain the inconsistency between her finding that the jobs as performed required frequent cervical motion but not as generally performed.

Therefore, Mr. Killion's claim must be remanded to the Commissioner for reconsideration of her ALJ's step-four finding. The Commissioner must determine the cervical-motion requirements of the meter-man and cut-off-man jobs as they are generally performed; explain any inconsistencies between the jobs as Mr. Killion

14

performed them, with frequent cervical motion, and as they are generally performed;[5] and, she must explicitly determine Mr. Killion's current capacity for cervical motion, if it become necessary in light of her other findings.

**2. Credibility determination.** Mr. Killion contends that the ALJ erred by rejecting his allegations of standing, walking, and neck-motion difficulties without offering a reasonable, supported rationale. He argues two specific errors. First, that the ALJ's credibility discussion used the "meaningless boilerplate" language that has been criticized by the United States Court of Appeals for the Seventh Circuit, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). Second, the ALJ cannot rely on inconsistent objective medical evidence, such as retention of full strength and sensation, because symptoms cannot be measured objectively. (*Plaintiff's Brief* [doc. 18], at 26-27.)

The Seventh Circuit has held that the mere use of the "boilerplate language" is not automatically erroneous if an ALJ articulates grounds for her credibility determinations. *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). In this case, the ALJ articulated reasons for her credibility findings (regardless of their merit) that track the requirements of S.S.R. 96-7p. (R. 29-31). It also is evident that the ALJ did not discount Mr. Killion's

---

[5] The Court notes Mr. Killion's counsel's comments at the hearing that Mr. Killion's employer, Indianapolis Power & Light Company, is a very large company that covers "the entire central Indiana area," that it is the only employer in the area for which Mr. Killion could perform the subject jobs, and that "the way that he performed [the jobs] is literally the way that it's performed in this region." (R. 86-87.) On remand, the Commissioner must explain any difference between how IPL's personnel perform the subject jobs and how the industry generally performs them, regarding the relevant cervical-motion and driving functions. The Court also again notes the testimonies of Mr. Killion and the vocational expert that indicate that the job of meter man is likely obsolete now.

15

allegations of disabling symptoms because objective medical evidence did not confirm them. Objective findings — such as ranges of motion, strengths, atrophy, gait, station, sensation — can be considered in the credibility analysis if they are inconsistent with a claimant's allegations of symptoms or functional limitations. S.S.R. 96-7p. Here, the ALJ did note Mr. Killion's normal or mildly limited sensations, strengths, and ranges of motion, but there is no indication that she required objective medical evidence to confirm his symptoms and limitations. She also noted his allegations, what she described as his conservative course of treatments, (R. 30), the fact that he was given a step stool to avoid excessive overhead looking, (R. 29), and opinion evidence, (R. 30-31).

Mr. Killion has not shown that the ALJ committed error in her credibility determination.

**3. Intolerance of weather extremes.** Mr. Killion argues that the ALJ failed to "carefully consider" whether his past relevant work as generally performed required exposure to temperature extremes. (*Plaintiff's Brief*, at 25.) His testimony and his employer's supplied job descriptions established that both the meter-man and cutoff-man jobs were largely performed outdoors and the vocational expert testified that the jobs as generally performed entail exposure to temperature extremes, (R. 83). Mr. Killion further testified that the pain in his neck is exacerbated by exposure to hot and cold weather. (R. 81.) The Commissioner's only response is that Mr. Killion points to no evidence in the record "that would have compelled the ALJ to find he was more limited physically." (*Defendant's Memorandum in Support of the Commissioner's Decision* [doc. 23], at 4.) She

16

argues that Mr. Killion's testimony of temperature sensitivity "is not sufficient evidence to compel the ALJ to include additional limitations in the RFC finding." (*Id.*) She goes on to note that the record contains no complaints of temperature-caused headaches and no physician opinion that extreme temperatures would increase his symptoms to such a degree that he would be unable to tolerate work that would require temperature extremes. (*Id.*, at 4-5.)

Because the ALJ did not address or evaluate Mr. Killion's allegation of temperature sensitivity at all — and, therefore, the Court cannot consider her arguments as support for the ALJ's decision — the Court construes the Commissioner's argument as a harmless-error argument; in other words, that the issue should not be remanded on this ground because it is not reasonable to assume that reconsideration could change the disability decision. However, because Mr. Killion's claims are being remanded for an independent reason, the Commissioner shall also consider, and articulate her consideration of, the effect of temperature extremes on Mr. Killion's cervical-motion limitation and, ultimately, on his ability to perform the subject jobs as generally performed.

## Conclusion

The Commissioner's denial of Mr. Killion's application for disability benefits will be reversed and his claim will be remanded for reconsideration consistent with the holdings and instructions in this *Entry*.

**DONE this date:** 09/29/2015

*Denise K. LaRue*
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana


Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.